In re CASELDINE.

No. 10179.

United States District Court
S. D. Ohio, W. D.

May 1, 1952.

Emerson L. Horner, Dayton, Ohio, for objector, Household Finance Corporation.

Maurice R. Katz, Dayton, Ohio, for bankrupt.

NEVIN, Chief Judge.

This cause is now before the Court on a petition filed by the bankrupt herein, for review of an order entered by the Referee in Bankruptcy on December 11, 1951, wherein the Referee sustained an objection to the discharge of the bankrupt and held that the bankrupt "is denied a discharge".

The entry just referred to reads as follows: "This matter came on to be heard upon the Specifications in Objection to discharge of the within bankrupt, filed by Household Finance Corporation and upon the evidence. The Court finds: 1. That the specification of objection to discharge is supported by the evidence presented. 2. That the bankrupt is not entitled to a discharge by reason thereof. Therefore, it is ordered, adjudged and decreed that the specifications of grounds of objections to the discharge of the within bankrupt, filed by Household Finance Corporation, should be, and is hereby sustained and said bankrupt is denied a discharge. Exceptions saved for bankrupt".

Bankrupt seeks to have the foregoing order reversed and in her petition for Review prays that "said findings of fact be reviewed and said Conclusions of Law be reversed * * * and that she be restored to all things she has lost by reason of said error".

Along with the pending petition for review, there was filed the Opinion of the Referee, dated December 5, 1951, in which the Referee states his findings and conclusions upon which his order of December 11, 1951, is based; the Referee's "Certificate of Review" and all of the papers referred to therein, including a transcript of the hearing before the Referee in connection with the matter.

The objecting creditor who filed specifications in objection to the discharge of the bankrupt is Household Finance Corporation, a company whose business is to loan money, and which has an office or place of business in the City of Dayton, Ohio.

Introduced at the hearing before the Referee, were two documents marked respectively, Exhibits A and B. Exhibit A is a printed form entitled "Financial Statement". After listing certain indebtedness it is stated thereon that "I have no other debts". It is signed by the bankrupt.

Two items of indebtedness are listed by bankrupt in Exhibit A, as follows: "Present loan balance with Household Finance Corporation, $187.20; Maxwell Finance, $320.00".

The record shows that bankrupt was not a stranger to Household Finance Corporation, the objecting creditor. Exhibit A is dated October 21, 1950. As indicated on Exhibit A, there was then outstanding, a

present loan balance with Household Finance Corporation of $187.20.

Exhibit B (and other evidence in the case) shows that bankrupt was employed by the United States Government at Wright Field, near Dayton, Ohio; that on August 10, 1949, she had made a loan from Household Finance Corporation in the sum of $303.28; that she had paid this loan down to the sum of $187.20, noted on Exhibit A, and that her payments were rated by Household Finance Corporation as "Good".

The record further shows that bankrupt became delinquent in her payments to Household Finance Corporation and that it sent one of its collectors to her home one evening because of these delinquent payments; that she explained to the collector that at the time she was quite sick with the Flu; that her husband had left her and had taken their automobile, on which there were delinquent payments to Maxwell Finance Company; that she was having a hard time getting along because of her illness and "this bill with Maxwell" and that she thought the only thing she could do would be to go through bankruptcy. She testified (Tr. p. 41) "Then this man (the collector for Household Finance Corporation) came out in the evening and I was home sick; had a very bad case of the Flu; * * * I got very much upset while he was there and told him I didn't know what I was going to do; didn't see any way out for me but bankruptcy. He said 'you don't want to do that' * * * and he said 'Why don't you borrow some more money' and he said he would call Mr. Stone (Assistant Manager of Household Finance Corporation) and he called him up and I talked to him and he told me to come down in the morning".

The foregoing testimony stands uncontradicted in the record because the Collector of Household Finance Corporation who went to see bankrupt at her home, was not called as a witness and did not testify in the case.

Bankrupt further testified that when she wrote the words "I have no other debts" in Exhibit A, she did so at the suggestion of Mr. Stone at the office where she went the next day and that Mr. Stone was fully conversant with her indebtedness and knew all about her financial condition, due to the fact that she had dealt with the company since at least August 10, 1949.

Mr. Stone denied having suggested what bankrupt should write in Exhibit A, and in this he is corroborated to some extent, at least, by the witness Pauline Howerton, who was employed at the time as a "Steno-Clerk" by Household Finance Corporation. Mr. Stone also denied that he knew about or was conversant with bankrupt's other indebtedness.

However, he did know that she was delinquent in some of her payments to Household Finance Corporation itself. It was for that very reason that the collector was sent to her home. Mr. Stone also knew that bankrupt was in arrears in her payments to the Maxwell Corporation.

He knew, too, that even so, the suggestion that bankrupt make a further loan or "borrow some more money" (Tr. p. 41) from Household Finance Corporation came *not from the bankrupt but from Household Finance Corporation's own representative* (its collector).

Mr. Stone testified: (Tr. pp. 24–25) Q. 7. (by Mr. Katz, counsel for bankrupt) "Why would he (the collector) call at her home personally rather than go through the normal course of paying at the place of business? A. (By Mr. Stone) Because I could not reach her at her job, or during my work hours, she wasn't at home. Q. 8. Why would the collector go out and see her? A. Because her account was delinquent. Q. 9. The account was delinquent, and in discussing the account with her she had told you, according to what you said, she was having a hard time, and among other things she told you she was three payments behind with Maxwell, is that right? A. I believe that is true. Q. 10. And you still considered her, in the light of what she told you, the fact that she was delinquent with your company, the fact that she was delinquent with Maxwell, you still considered her a good risk? A. Yes sir".

Mr. Stone further testified (Tr. p. 27) "Q. 19. Now, isn't it a fact your reliance wasn't

so much upon what she had indicated in her financial statement as it was on the fact that she had done business with you for years before? Isn't that true? A. Well, you take both of them into consideration".

The Referee, in reaching his final conclusion (as evidenced by the statements in his "Opinion" dated December 5, 1951) seems to have been persuaded by the conflict in the testimony of Mr. Stone and Pauline Howerton upon the one hand, and that of the bankrupt upon the other, resulting (as the Referee found) in a shifting of the "burden of proof" from the objecting creditor to the bankrupt.

In the opinion of the Court, the issue here, however, goes deeper than one to be determined merely on the basis of a conflict in some of the testimony of the witnesses. The question here to be determined, before denying bankrupt her discharge is, whether or not bankrupt in what she said or did, did so with actual fraudulent intent. Do the facts disclose that what she did was done with intent to defraud, hinder and delay her creditors? To answer these questions the *whole* of the record must be considered. *All* of the testimony and documentary evidence by way of Exhibits must be weighed, in the light of common experience, and each part of it given such weight as it properly deserves.

■ It has been many times held that it is not so much the acts of the bankrupt, that will prevent his discharge, as it is the intent with which he acts. This is the effect of the decision by the Court of Appeals of this (6th) Circuit in Third Nat. Bank v. Schatten, 81 F.2d 538, wherein a number of supporting cases are cited, including Morimura, Arai & Co. v. Taback, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586; Firestone v. Harvey, 6 Cir., 174 F. 574; Franklin v. Monning Dry Goods Co., 5 Cir., 217 F. 929, and Aller-Wilmes Jewelry Co. v. Osborn, 8 Cir., 231 F. 907.

In the Monning Dry Goods Co., case supra, 217 F. at page 929 it was held "that the word 'false' in such section (Bankrupt-

cy) was not used in its vernacular sense of erroneous or untrue, but rather as untrue coupled with a lying intent, or intentionally untrue * * *," and in the Aller-Wilmes case, supra, 231 F. at page 907 it is stated that "A statement, to be materially false, so as to justify the refusal of a discharge to a bankrupt * * * must be not only false in fact in a material matter, but must have been with the intention to deceive."

After citing the foregoing cases, the Court of Appeals of this Circuit in the Schatten case, supra, 81 F.2d on page 540 says: "These decisions were made before the amendment of 1926 to section 14b, [11 U.S.C.A. § 32, sub. b], but they are no less relevant by reason of the amendment."

In the matter of Bernstein, Bankrupt, No. 6881 in this Court, this Court stated in passing on a Petition for Review that: "It has been repeatedly held that a bankruptcy law is a remedial statute and should not be subjected to a narrow or illiberal interpretation; it should be construed reasonably and according to the fair import of its terms, with a view to effect its objects and to promote justice. Many cases to this effect are cited in Title 11, U.S.C.A.".

■ Upon a consideration of all of the evidence in the case as disclosed by the whole of the record and the applicable law, and after giving to the opinion of the learned Referee, that deference and weight to which it is properly entitled, the Court is of the opinion that the Referee erred in his conclusion and that the order entered by him on December 11, 1951, denying bankrupt a discharge, should be, and it is, reversed, and the prayer of bankrupt's petition for review, that she be restored to all things she has lost by reason of "said error" should be, and it is, granted.

This case is remanded to the Referee with instructions that the Referee issue to the bankrupt, Helen S. Caseldine, her discharge in bankruptcy.

Counsel may prepare and submit to the Court, an order in accordance herewith.