## BANK OF MONROE, OF MONROE, NEB., v. GLEESON.

(Circuit Court of Appeals, Eighth Circuit. November 28, 1925.)

No. 6989.

1. **Bankruptcy ⚖➡414(1)—Burden is on objector to establish facts relied on to prevent bankrupt's discharge.**

Burden is on objector to establish facts relied on to prevent bankrupt's discharge.

2. **Bankruptcy ⚖➡407(5)—False statement, preventing bankrupt's discharge, must have been made with knowledge of its falsity.**

False statement, relied on to prevent bankrupt's discharge, must have been made with knowledge of its falsity.

3. **Bankruptcy ⚖➡414(1)—Bankrupt's fraudulent intent in making false statement must be proved.**

Bankrupt's fraudulent intent in making false statement, relied on to prevent bankrupt's discharge, must be proved.

4. **Bankruptcy ⚖➡407(5)—False statement, preventing bankrupt's discharge, must have been relied on in relinquishing money or property or extending credit.**

False statement by bankrupt, set up to prevent bankrupt's discharge, must have been relied on in relinquishing money or property or extending credit.

5. **Bankruptcy ⚖➡414(3)—Evidence held to show that bank, opposing bankrupt's discharge, did not extend credit on faith of bankrupt's financial statement.**

Evidence *held* to show that bank, objecting to bankrupt's discharge, did not extend credit on faith of bankrupt's financial statement, but knew true state of his affairs.

6. **Bankruptcy ⚖➡414(3)—That one advancing money, property, or credit knew financial statement was probably false held strong proof that no weight was given to statement.**

Though one advancing money, property, or credit on faith of a financial statement is not bound to investigate truth thereof as respects Bankruptcy Law, where he has no knowledge of facts making reasonable man doubt truth thereof, that facts are known which would raise belief that statement is probably false is strong proof that no weight was given thereto.

Appeal from the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

In the matter of the bankruptcy of John F. Gleeson, wherein the Bank of Monroe, of Monroe, Neb., filed objections to bankrupt's discharge. From an order overruling the special master's findings and granting a discharge, objector appeals. Affirmed.

Fred A. Wright, of Omaha, Neb., and George F. Rose, of Genoa, Neb. (John J. Sullivan, George B. Thummel and Fred White, all of Omaha, Neb., on the brief), for appellant.

John C. Travis, of Omaha, Neb. (I. L. Albert and August Wagner, both of Columbus, Neb., on the brief), for appellee.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

STONE, Circuit Judge. This is an appeal from an order granting a discharge in bankruptcy. The appellant filed objections to the discharge which were sustained by the special master. The court overruled the findings of the master. The ground alleged for objecting to the discharge was that the bankrupt had, with fraudulent intent, made false statements for the purpose of obtaining loans of money and renewals of indebtedness from the bank and that such loans and renewals had been secured thereby. The objectionable statement was an item contained in several financial statements made by the bankrupt to the bank at different dates. This item was that he listed among his assets, contained in such financial statements, "an undivided one-eighth interest in 280 A. land" which he valued, therein, at $7,000. He had no such interest.

[1-4] While the matters presented by this appeal are questions of fact, it is necessary to bear in mind the pertinent rules of law. The applicable law is settled and may be stated as follows: The burden is on the objector to establish the matters of fact relied upon to prevent the discharge. 1 Coll. on Bankruptcy (13th Ed.) 510, and numerous citations. The false statement must have been made with the knowledge that it was untrue. 1 Coll. on Bankruptcy (13th Ed.) 555; Cooper and Another v. Schlesinger and Another, 111 U. S. 148, 4 S. Ct. 360, 28 L. Ed. 382; Aller-Wilmes Jewelry Co. v. Osborn, 231 F. 907, 146 C. C. A. 103 (8th C. C. A.); International Harvester Co. of America v. Carlson, 217 F. 736, 133 C. C. A. 430 (8th C. C. A.); 1 Coll. on Bankruptcy (13th Ed.) 558; Acme Harvester Mach. Co. v. Bennett, 277 F. 425 (8th C. C. A.); and with an intention to deceive, Aller-Wilmes Jewelry Co. v. Osborn, 231 F. 907, 146 C. C. A. 103 (8th C. C. A.). The fraudulent intent is a matter of fact to be proven. 1 Coll. on Bankruptcy (13th Ed.) 555, and citations. The false statement must have been relied upon as the basis or as one of the reasons for relinquishing money or property or extending credit. 1 Coll. on Bankruptcy (13th Ed.) 553, and citations;

Aller-Wilmes Jewelry Co. v. Osborn, 231 F. 907, 146 C. C. A. 103 (8th C. C. A.). Also see Cleland v. Iowa Loan & Trust Co., 260 F. 653, 171 C. C. A. 417 (8th C. C. A.).

The particular matters contested and upon which the evidence or the inferences to be drawn therefrom are in conflict, are, first, as to the knowledge of the bankrupt that the statement was false; second, as to any intent to obtain anything as a result thereof; third, as to the statement being either made or accepted as the basis of credit; fourth, as to belief in the truth of the statement by the one extending the credit; fifth, as to extension of credit because of the statement.

[5] This discharge hinges more upon inference to be drawn from undisputed evidence rather than from a positive dispute in the evidence itself. The only positive dispute in the evidence itself is as to whether the false item in the statements was there when the statements were signed by the bankrupt. As to this item, the master found the item was there at that time and it seems to us that finding is supported by the testimony. The facts, as shown by the evidence without question, are as follows: The bankrupt was a young married farmer, cultivating all or a portion of a 280-acre farm two miles from a small village wherein the objector had for years conducted business as a bank; that the bank, besides doing a regular banking business, was a sort of agent for the state treasurer in the collection of taxes on local property and also carried on a fire and hail insurance business. The president, to whom the false statement was made, had been cashier or president thereof and had lived in that community since September 1, 1915, and must have been familiar, in a general way, with property and financial matters thereabout. The father of the bankrupt had owned a farm of 280 acres within two miles of the village for many years until his death, more than fifteen years before the false statements here were given. He died leaving a wife and eight children, both sons and daughters. The farm had been left to the wife in whose name it appeared thereafter on plat books in that vicinity. The bank had such plat books and had occasion to refer to them in connection with collection of the taxes and issuance of hail insurance on crops cultivated by the bankrupt on the farm. The bank had made various loans, all unsecured, to the bankrupt which were evidenced by his notes. On September 30, 1921, these notes aggregated $2,037.25. They were at that time renewed in the form of one note for that amount. About that time, the state banker's

board made a ruling requiring state banks to have financial statements as to assets accompanying all loans of $500 or more. In compliance with that ruling, Pierson, the president of the bank, told the bankrupt that, under this requirement, he would have to make a statement of his assets to satisfy the state bank examiner. In compliance with this request, the bankrupt made a statement of various personal property and liabilities which showed a net worth of only $464. Pierson figured up this statement and saw that it would not satisfy the bank examiner. He communicated this to the bankrupt and asked if he had any other property which would increase his assets. The bankrupt replied that he had no other personal property. He told him that he was not the owner of the farm but that it had been left to his mother by his father and that she was to have the entire farm and land as long as she lived and then it was to go to the heirs; that his father "wanted the boys to have the farm" and that his one-eighth interest in the farm, he thought, was worth $7,000. In accordance with this statement of the bankrupt, there was added to the statement the item "undivided one-eighth interest in 280 A. land —$7,000." From the time of the above signed statement until February 13, 1923, when a similar statement was made, the indebtedness of the bankrupt to the bank fluctuated, through payments and additional loans, until, at the later date, it amounted to $2,390. At that time, a second statement was made setting forth in detail personal property, the same statement as to the land and the liabilities. This second statement showed a net worth of $225 over the land. After the second statement, other loans were made so that at the time the petition in bankruptcy was filed, there was an indebtedness represented by a note, dated December 11, 1923, for $2,775.19. The bankrupt testified that he was about five years of age when his father died; that he knew nothing of the title to the land except as told to him by his mother and that the statement he made Pierson was in accordance with that information given by his mother. These circumstances concerning the bankrupt's knowledge, coupled with the purpose, as stated to him by Pierson, for making the statement, seem to us to negative any intent on the bankrupt's part to state an untruth or to obtain credit on the strength of such statement. The clear impression given by Pierson to him was that such a statement was necessary to satisfy the state bank examiner and comply with the rule of the state board. It was for the sole

purpose of giving the bank clearance for holding this unsecured indebtedness and had no connection, at the time either of these statements were made, in the minds of either Pierson or the bankrupt, of being made for the purpose of inducing the bank to think that the bankrupt was a desirable borrower. Therefore, the necessary knowledge and necessary intent on the part of the bankrupt in making an untrue statement fail of proof.

[6] As above stated, the purpose of the statement had nothing to do with the extension of credit and formed no part of the inducement therefor in the mind of Pierson. It was for the sole purpose of complying with the rule and to satisfy the examiner when he might inspect the paper in the bank. Even had this statement been taken for the purpose of ascertaining whether the bankrupt was a desirable loan risk, the evidence clearly shows that the information of Pierson and of the other officers in the bank was such that they would know the statement was untrue or would be placed under a duty of inquiry, which would have resulted in such knowledge. While it is no part of the duty of one who gives money, property or credit, on the faith of a financial statement, to investigate the truth of that statement, in so far as the bankruptcy law is concerned, and while such a statement may be accepted at its face value, where the one so accepting has no knowledge of facts which would make a reasonable man seriously doubt the truth of the statement, yet, where such facts are known as would raise a belief that the statement was probably false, it is difficult to conclude that a reasonable man would give a statement any weight under such circumstances and it is strong proof that no such weight was given. Here, Pierson knew that when he had asked for the first of these statements the bankrupt gave to him what he thought was a complete statement of his assets and those assets (totalling $3,200) consisted entirely of personal property. It did not occur to the bankrupt, although his interest required a full statement of assets, to list any interest in land, although he valued it at $7,000—more than twice the value of all the personal property he had listed. It was only when Pierson insisted upon the necessity of further property to satisfy the examiner that the land was ever mentioned. Also, Pierson and other officers of the bank had for years given tax receipts on this land in the name of the mother and collected such taxes from her, and Pierson had issued hail insurance covering crops grown by bankrupt on this land to the bankrupt as "tenant."

The plat book, showing ownership of this land in the mother, had been in the bank and in frequent use by Pierson and other officers for more than five years before the first of these statements was made. Also, repeated loans had been made to the bankrupt by the bank and he was continuously indebted to it for years before the first statement, and it is unreasonable to suppose that such credit had been allowed without investigation of or familiarity with the bankrupt and his concerns. Also, loans had been made to a brother of the bankrupt, who had made statements of assets to the bank, without any claim by such brother of any interest in this land. In short, every circumstance points to such knowledge, in the bank, of the connection of the bankrupt with this land as would convince a reasonable man that he had no legal interest therein or would make a reasonable man so doubtful of the existence of such an interest that he would not consider it a basis for extension of credit. Therefore, we think the evidence shows that no credit was extended on the basis of these statements and that the burden of evidence is that the bank knew the true state of affairs.

We think the court was right in overruling the report of the master and in decreeing the discharge of the bankrupt. Therefore, the decree should be and is affirmed.