**BAASH–ROSS TOOL CO. et al. v. STEPHENS.**

No. 7325.

Circuit Court of Appeals, Ninth Circuit.
Nov. 26, 1934.

Raphael Dechter, of Los Angeles, Cal., for appellant.

Frank H. Love, of Los Angeles, Cal. (Abrahams & Love, of Los Angeles, Cal., of counsel), for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

This is an appeal from an order granting a discharge in bankruptcy to one Ralph L. Stephens, appellee, who will herein be designated as the bankrupt.

The bankrupt applied for his discharge, and certain creditors, to wit, Baash-Ross Tool Company, State Oilfields Supply Company, Standard Pipe & Supply Company, A. D. Mitchell, Frances Hargrove, and Juanita Cook, filed specifications of grounds of opposition to such discharge. The petition for a discharge and the objections thereto were referred to the referee in bankruptcy, as special master, for the purpose of hearing the objections and reporting his findings to the court. In the report of the special master he found the facts as alleged in all of the objections to be untrue, and recommended that the bankrupt be discharged. Exceptions to the report of the special master were filed and were overruled by the District Court, whereupon this appeal was taken from the order confirming the report of the special master and granting the bankrupt his discharge.

The principal contention of the objecting creditors on this appeal, and upon which they base their claim that by virtue of section 14b, subd. 3, of the Bankruptcy Act, as amended in 1926 (11 USCA § 32 (b) (3), the bankrupt is barred of his discharge, is that said bankrupt, for the purpose of obtaining property or credit from two of the objecting creditors, made materially false statements in writing concerning his financial condition, showing a net worth of $250,000, whereas the bankrupt was insolvent. The two objecting creditors above referred to are the Baash-Ross Tool Company and the State Oilfields Supply Company; none of the other objecting creditors contend that any false statements were made to them to secure money or credit.

The bankrupt had a one-third interest in the Conservative Petroleum Company, a corporation, and was called upon by two of the objecting creditors, Baash-Ross Tool Company and the State Oilfields Supply Company, to guarantee the indebtedness of that corporation to them. In connection therewith two financial statements were given to the Baash-Ross Tool Company, one dated March 3, 1930, and the other October 4, 1930, and which have been marked Objecting Creditors' Exhibits 1 and 2, respectively. The bankrupt in his testimony stated that he executed said financial statements in order to induce the Baash-Ross Tool Company to accept his guaranty of the account of the Conservative Petroleum Company, to whom they furnished credit for more than $8,000, relying upon said financial statements and guaranty. The statement of October 4, 1930, Objecting Creditors' Exhibit 2, was made out because more detailed information was requested. On September 30, 1930, a third financial statement, which is designated as Objecting Creditors' Exhibit 3, was executed by said bankrupt in order to induce the State Oilfields Supply Company to give an extension of thirty days on money due them by the Conservative Petroleum Company. The State Oilfields Supply Company had demanded payment of the account, and would not give an extension unless payment thereof was guaranteed by said bankrupt. Thereafter no materials or credit were furnished or extended by it to the said Conservative Petroleum Company, other than the aforementioned thirty-day extension on the existing indebtedness.

Subsequent to the giving of these statements, in January, 1931, at the time of the examination of the bankrupt under section 21 (a) of the Bankruptcy Act (11 USCA § 44 (a), the bankrupt submitted to the attorney for the trustee an additional statement in writing, showing the condition of his affairs at the time of the filing of the petition in involuntary bankruptcy, this statement being marked Objecting Creditors' Exhibit 4. This exhibit was no part of the financial statement furnished to appellants, and was not relied upon in granting the extensions of credit heretofore mentioned. However, it is upon certain alleged discrepancies between the financial statement submitted to the creditors and this latter statement given by the bankrupt at the time of the bankruptcy hearing that appellants urge objections to the discharge of the bankrupt. Further objections upon which appellants lay much stress consist of certain real estate values contained in these financial statements, which are alleged to have been grossly exaggerated by the bankrupt.

The appellants submit that the alleged discrepancies above referred to consist of a difference in incumbrances on land as shown on Objecting Creditors' Exhibits 2 and 3 and those stated in Objecting Creditors' Exhibit 4. They point out that in Exhibits 2 and 3 the bankrupt sets forth his assets, consisting of real estate, stocks and bonds, etc., at the sum of $266,859.39, and shows incumbrances on the land therein included the sum of $70,897.00, whereas in Exhibit 4 there is shown as incumbrances upon his land the sum of $114,568.37, or a difference of $43,671.37. It is to be noted that in Exhibits 2 and 3 there

was no itemization of stocks and bonds; they were included with the real estate, and together therewith were shown as one figure. However, in Exhibit 4 there does exist an itemization of the stocks and bonds, showing the total value to be $36,315.14, which amount, when added to the itemized real estate totaling $250,400, shows a total value of real estate, stocks and bonds of $286,315.14, and, when compared with the corresponding figure in Exhibits 2 and 3 of $266,859.39, it shows an increase in value of $20,000. Without taking up these different statements and reports in too much detail, it might well be observed that Exhibit 2 purported to show the financial condition of the bankrupt on September 1, 1930, and that Exhibit 4 was a statement of his affairs at a time not less than five months thereafter, and an inspection of the two statements reveals several differences, some decreases, some increases, in the corresponding items thereof. These differences would seem to clearly indicate that in the bankrupt's affairs much transpired during the interim between the two statements, and that by reason thereof a comparison of the statements is of little assistance in ascertaining the truth or falsity of the items set forth in Exhibit 2.

The record shows that the bankrupt was continuously disposing of properties and acquiring other properties, so that the amount of incumbrances was a fluctuating one. Objecting Creditors' Exhibit 4 was a list of properties and respective incumbrances at one time or another a part of the assets and liabilities of the bankrupt, not in any sense a financial statement, but, on the contrary, a mere recital of properties without in any way attempting to represent that they were contemporaneously owned, so that the addition of the values on the one hand or the incumbrances on the other is meaningless. This report was prepared by the bankrupt's secretary, a Miss Smith, and contained several inaccuracies.

With reference to the alleged grossly exaggerated values of the bankrupt's real estate holdings as shown in Exhibit 4, appellants rely principally upon the values placed on two particular parcels of realty, one consisting of 15 acres of land located at Downey, Cal., more particularly described as lot 1, tract 1290, and the other being known as the Long Beach boulevard property, comprising what is described as lots 187 and 188 except W. 52' of tract 3233.

The valuation placed upon the 15 acres at Downey in Objecting Creditors' Exhibit was $85,000, subject to incumbrances of $41,940.

As heretofore stated, the values as given in this exhibit were as of the year 1930. The appellants produced as a witness one D. H. Culver, who testified that he had been engaged in the real estate business for the last six years, that he had examined the said property at Downey, and that in his opinion its value during the latter part of 1930 was $30,000. On cross-examination, when asked whether or not he had examined the property in the year 1930, the witness replied that he had not. In regard to this property, the bankrupt testified that he had purchased it in 1925 or 1926 for the sum of $40,000, and had incumbered it by a first mortgage of $30,000, and had borrowed $15,000 additional in 1929 from the Associated Oil Company, secured by a second incumbrance thereon. The values placed upon these properties by appellants' witness are not at all convincing. Having in mind the amount of the incumbrances placed upon this property, also that at the time these premises had prospective values as oil land, and further that the second incumbrance consisted of a loan by the Associated Oil Company, which admittedly possessed experience and information in connection with oil lands and their values, it is hardly conceivable that such a company would advance money on property already mortgaged for an amount equal to its market value.

With respect to the Long Beach boulevard property, a valuation was placed by the bankrupt again at $85,000 subject to an incumbrance of $29,000. The appellants' witness, Culver, testified that in his opinion these lots were, in September and October of 1930, worth the sum of $20,000. On the other hand, the bankrupt testified that at the time he purchased this property, in 1929 or 1930, he paid $46,000 therefor, and that he gave back an incumbrance of $35,000. Here again the amount of the incumbrance is out of all proportion to the valuation quoted by appellants' witness.

The bankrupt testified that he honestly believed the properties set forth in the financial statements to be worth the appraised value, as therein set out, basing his belief upon his experience in the real estate business, in which business he had been engaged for many years, and also from independent appraisals he had secured from others.

The bankrupt appellee in his brief contends that the appellants' witness, Culver, was not testifying as to real estate values in the year 1930 but about values in 1933. The witness Culver stated in his testimony that he was giving his estimation as to the worth of

the land in question in 1930. In this connection the special master stated: "Looking back and trying to appraise this property now, I do not believe it is hardly a fair method of appraising it, because when you look back you naturally come to the conclusion that this property is not worth anything, but whether it is a fair way or not is the point. His judgment of what it was worth at that time would be warped by what it was worth since that time. We would say that almost anybody might know that property is worth nothing now, but that it may have been worth considerable at that time."

In the case of Morris Plan Bank of Richmond, Va. v. Henderson (D. C. N. C., 1932) 57 F.(2d) 326, a bankrupt for the purpose of obtaining a loan made a written statement to the effect that he owned real estate of the value of $50,000 in May, 1930, whereas the amount realized when the property was foreclosed in the latter part of 1931 was below $22,000. The court, in holding such fact to be insufficient to show a materially false statement within the statute preventing discharge, stated that courts must take notice also of the universal depression in real estate values in this state (North Carolina) during that period. Needless to say, the marked decline in real estate values during the period referred to was not confined to North Carolina, but, on the contrary, was nation-wide, California not excepted.

■ Appellants make reference in their brief to the fact that there was no mention made in Objecting Creditors' Exhibit 2 that the stocks and bonds which were therein included with real estate holdings under one asset figure were in fact at the time of the rendering of said statement pledged. The bankrupt testified that the itemization of stocks and bonds in Objecting Creditors' Exhibit 4, aggregating a sum in excess of $36,000, represented the same stocks and bonds referred to in Objecting Creditors' Exhibits 2 and 3; that all of said stocks and bonds prior to and at the time of the execution of the two latter exhibits had been pledged, but that such fact was not disclosed in either of said two exhibits, and that such fact was revealed for the first time in the account rendered to the trustee in bankruptcy (Objecting Creditors' Exhibit 4). However, the record fails to show the amount for which these stocks were pledged, consequently it is impossible to determine to what extent their asset value had been reduced due to having been pledged. While such conduct on the part of the bankrupt was obviously very improper, still taking into consideration the fact that the amount of the stocks and bonds was relatively small when compared to the total amount of his net worth ($258,000), it does not in our opinion constitute such an intentional misrepresentation as would warrant the denial of his discharge.

■ Appellants place considerable stress in their briefs upon the fact that in none of the three financial statements furnished to the objecting creditors did the bankrupt mention the fact that a suit was pending against him for a sum approximating $17,000. It appears from the record that, subsequent to the giving of these statements, this suit was reduced to judgment. However, it is to be observed that on July 11, 1929, the bankrupt had obtained a judgment in the sum of $256,162.20, with interest from said date, against the party who was suing him, and which larger judgment arose out of the same subject-matter. At the time of the giving of the financial statements, the bankrupt did not include among his assets this existing judgment in his favor. This particular litigation finally resulted in the setting aside of the larger judgment previously obtained by the bankrupt and the entering of the $17,000 judgment here in question in favor of the opposing party. It appears that the bankrupt regarded the smaller litigation as being no more than a species of offset against the larger judgment in his favor, and he testified: "He owed me; I didn't claim I owed him." There was no testimony or evidence introduced at the hearing which tended to show an absence of good faith on the part of the bankrupt in believing that he had a justifiable claim, nor was any showing made which would tend to indicate that the bankrupt could have reasonably foreseen the way in which the matter would necessarily terminate in court. The bankrupt's conduct with reference to this suit which was pending seems sufficiently consistent with innocence and good faith to warrant the special master in finding that such omission was not made with the intent of falsifying his financial statements or for the purpose of defrauding his creditors. To defeat a discharge on the ground that a bankrupt omitted obligations from a financial statement made by him, it is necessary to show either expressly or impliedly that he knew the obligations existed and could be enforced against him. In re Maaget (D. C. N. Y.) 245 F. 804. See, also, In re Kerner (C. C. A. 2) 250 F. 993.

■ The appellants make a point of the fact that the bankrupt carried the legal title to most of his real estate holdings in the names

of other people, for the purpose, as alleged by said appellants, of defrauding his creditors and rendering himself insolvent. This contention is not supported by the evidence. Nowhere in the record does it appear that any of such transfers of property were made in contemplation of insolvency, nor does it appear that the insolvency of the bankrupt was occasioned by the fact that he carried certain parcels of realty in the names of dummies. The testimony of the bankrupt was to the effect that he had been making a practice of carrying his property in this manner for a period of two years prior to his bankruptcy, and did so for the purpose of facilitating the purchase of property at the lowest possible price because he claimed that, due to his connection with the banking business, people would raise the price of property if they suspected that he was the purchaser. The appellants do not claim that the bankrupt was not the actual owner of the property held in this manner, neither do they claim that the bankrupt failed to account therefor in any way, nor have they proved that there was an actual intent on his part to defraud his creditors by transferring his property before bankruptcy, and, in the absence of such a showing on the part of the appellants, this court is disposed to hold that the special master and the District Court were justified in finding that there was nothing irregular with such an arrangement.

As evidence of the bankrupt's good faith and desire to be honest in making out his financial statements, it is to be further observed that he had a one-third interest in the Conservative Petroleum Company, and did not include his oil holdings in his financial statements. In speaking of his net worth, as shown by the financial statements, the bankrupt testified: "Well, if my oil holdings were worth anything, I considered I was worth even more than that, and it did not include that, did not include those."

Furthermore, it appears from the uncontradicted testimony of the bankrupt that the principal objecting creditor, the Baash-Ross Tool Company, did not rely solely and exclusively upon the two financial statements

rendered to them. The bankrupt testified that, before any material was furnished or credit extended by said company, the second financial statement (Exhibit 2) was turned over to one Neely, the credit manager of said company, and that he went over each item in said statement with Neely and fully explained different transactions to him, and that he accompanied Neely one day on an examination of several different pieces of real estate set forth in the said financial statement. The bankrupt further testified that he took Neely to see the manager of a bank with which he dealt, and that Neely inquired of said bank manager concerning his (the bankrupt's) credit standing. Neely was not produced as a witness by either side.

■■ Under the well-recognized rule, a false statement sufficient to bar a bankrupt's discharge must have been made as to a material matter false to the bankrupt's knowledge, and with fraudulent intent. Hartsfield Co. v. Smith (C. C. A. 5) 61 F.(2d) 723; In re Johnson (D. C. Conn. 1932) 1 F. Supp. 649. As we have heretofore stated, we do not consider that the inaccuracies which existed in the bankrupt's financial statements were of a sufficiently serious or material nature to constitute a bar to his discharge. Whether or not the bankrupt fraudulently intended to falsify his statements in any particular for the purpose of obtaining credit was largely a question of fact.

■■ Furthermore, discharge in bankruptcy is a legal right, and the burden is on an objector to establish facts relied upon to prevent the same. The correct rule has been well stated by this court, speaking through Judge Gilbert, as follows: "* * * The question of the right to a discharge is addressed to the sound discretion of the District Court, with the exercise of which, except in case of gross abuse, an appellate court will not interfere." In re Merritt (C. C. A. 9) 28 F.(2d) 679.

This case was later approved in Re Silverstein (C. C. A. 9) 35 F.(2d) 497, and again in Spies v. Sytsma (C. C. A. 8) 56 F.(2d) 520. We find no such abuse of discretion.

The order of the District Court is affirmed.